## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SEAN FOUNTAIN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| ) | |
| v. ) | Civil Action No. 21-CV-11046-AK |
| ) | |
| CITY OF METHUEN, NEIL ) | |
| PERRY, MICHAEL R. SIMARD, ) | |
| DAVID BEAUREGARD, JR., and ) | |
| JAMES MCCARTY, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM AND ORDER

**A. KELLEY, D.J.**

Sean Fountain ("Fountain") has brought this suit against the City of Methuen ("Methuen"); Neil Perry ("Perry"), the mayor of Methuen; and three Methuen City Council ("City Council") members, Michael R. Simard ("Simard"), David Beauregard, Jr. ("Beauregard"), and James McCarty ("McCarty"). Fountain previously served as a City Council member and eventually became a permanent intermittent police officer for Methuen. He alleges a variety of federal and state civil rights violations and numerous state common law claims in connection with comments the defendants made about his role on the police force and his termination from that employment. The defendants have filed a motion for judgment on the pleadings, asking the Court to enter judgment in their favor on all claims. [Dkt. 25]. Fountain opposes the motion. For the following reasons, the defendants' motion for judgment on the pleadings [Dkt. 25] is **GRANTED IN PART** and **DENIED IN PART**.

I.      **Background**

The following facts are drawn from the complaint and taken as true for the purposes of a motion for judgement on the pleadings.  See Rivera-Gomez v. de Castro, 843 F.2d 631, 635 (1st Cir. 1988); see also Fed. R. Civ. P. 12(c).  Fountain was a member of the Methuen City Council from January 2012 through December 2017.  [Dkt. 1 ("Complaint") at ¶ 10].  At various points during his time as a city councilor, Fountain worked as a firefighter for the North Andover Fire Department, performed investigations for the Enforcement Unit of the County Sherriff's Office, and served as a part-time intermittent police officer for the Methuen Police Department ("MPD").  [Id. at ¶¶ 12–13].  In July 2016, Fountain sought guidance from the State Ethics Commission as to whether he could become a full-time permanent intermittent police officer, as his role on City Council was a potential conflict of interest.  [Id. at ¶¶ 14–16].  After the State Ethics Commission responded that Fountain could serve in both roles and he received proper approval from state and municipal officials, including Methuen's mayor (then Stephen Zanni) and City Council members, Fountain became eligible for a position as a permanent intermittent police officer starting August 9, 2017.  [Id. at ¶¶ 17-21].  Intermittent police officers are not subject to the same training as regular reserve officers, patrol officers, and ranking officers, and they do not take the Civil Service Exam, which is required of the other officers.  [Id. at ¶ 50].  Intermittent police officers may not be promoted unless they take the Civil Service Exam.  [Id. at ¶ 52].  Fountain was voted into the Methuen Police Patrolmen's Association, Mass. C.O.P. Local 394, and was thus subject to the provisions set forth in the union's collective bargaining agreement, after becoming eligible to work as a permanent intermittent police officer.  [Id. at ¶ 22].

In the fall of 2017, prior to Fountain assuming the role of permanent intermittent officer, City Council had to vote on the contracts for MPD's superior officers and department patrolmen. [Id. at ¶ 25].  Fountain abstained from voting on the patrolmen's contract in light of his upcoming employment as a permanent intermittent officer.  [Id. at ¶ 26].  Fountain did, however, vote on the contract for superior officers after seeking advice—which later turned out to be inaccurate—from City Solicitor Richard D'Agostino about whether he was eligible to participate in the vote.  [Id. at ¶¶ 27-30].  Fountain alleges he "was victimized [by the defendants] by a long and calculated course of harassment, retaliation, and other wrongful conduct which sabotaged and ultimately destroyed his personal and business reputation" in Methuen and his career with MPD after this vote.  [Id. at ¶ 33].

Fountain claims that McCarty and Simard began making "insulting remarks" about Fountain's employment with MPD while they campaigned for City Council seats from August 2019 to October 2019.  [Id. at ¶¶ 35-38].  The defendants' public criticism during election season "unleashed a torrent of negative media attention," calling into question the propriety of the vote on the MPD superior officers' contract and MPD hiring.  [Id. at ¶¶ 40-41].  By the fall of 2019, several government agencies had begun investigations into the vote's propriety at the request of City Council.  [Id. at ¶¶ 41-42].  In November and December of 2019, Fountain provided testimony to the U.S. Attorney's Office, the State Ethics Commission, and the Office of the Inspector General regarding the vote.  [Id. at ¶¶ 42-43].  Defendants McCarty, Simard, and Beauregard (the "City Council Defendants") were sworn in as City Council members on January 1, 2020.  [Id. at ¶ 39].  Eventually the details of Fountain's testimony were disclosed to City Council in a closed-door executive session meeting.  [Id. at ¶ 46].  The "attacks" on Fountain "escalated in content and frequency" after City Council learned of his testimony and "included

not only his vote on the [s]uperior [o]fficers' contract, but also the fact that he worked for the [MPD] without having taken the Civil Service Exam and no longer resided" in Methuen.  [Id. at ¶¶ 48, 55].

In the spring of 2020, the Inspector General and State Ethics Commissions concluded their investigations into City Council's vote on the superior officers' contract.  [Id. at ¶ 56].  Fountain did not receive any fine or punishment, though three other City Council members were disciplined for having a conflict of interest.  [Id. at ¶¶ 56-57].  Fountain eventually became a detective in the MPD, a role to which he "was assigned . . . not promoted, and thus there was no triggering of an obligation to take the Civil Service Exam."  [Id. at ¶¶ 59-60].  The City Council Defendants criticized Fountain's new role in several public forums.  [See id. at ¶¶ 63, 66, 67, 73, 74].  For example, in March 2020, Simard stated at a City Council meeting that a "detective who isn't certified and bypassed the hiring process is working major cases, even homicides."  [Id. at ¶ 63].  Simard made several similar comments at other City Council meetings.  [See id. at ¶¶ 67, 74].  McCarty also voiced his "unequivocal displeasure" over Fountain's work with MPD on several occasions, including at City Council meetings, to the press, and on social media.  [See id. at ¶¶ 66, 73, 74].  For example, in April 2020, McCarty posted a comment on Facebook that said, "WHY is former city councilor (detective) Sean Fountain the preferred handler of evidence rather than a twenty-year veteran such as [Arthur] Hardy?"  [Id. at ¶ 66].  McCarty was also quoted in a newspaper article regarding Fountain's role at MPD and participation in the superior officers' contract vote.  [Id. at ¶ 73].

Fountain sent cease-and-desist letters regarding these comments to City Council, the mayor, and Methuen's human resources department in April and May 2020.  [Id. at ¶ 71].  He then filed, with the help of counsel engaged by his union, a complaint pursuant to Methuen's

Whistleblower Act on May 12, 2020.  [Id. at ¶¶ 80-81].  That same day, Perry, the mayor of Methuen, sent a letter to Fountain stating that "within 90 days: (1) Mr. Fountain would be 'removed from the detective division' and 'reverted' to a Part-Time Intermittent Officer because he had 'not attended nor completed the full-time police academy training as required;' (2) he could only work shifts or details that were not otherwise filled by permanent patrol officers; (3) he was limited to 32 hours per week; and (4) in order to retain the lesser position of Part-Time Intermittent Officer, he must re-establish residency in the City."  [Id. at ¶ 82].  On July 8, 2020, Fountain received a letter from Methuen's Director of Human Resources, informing him that "due to COVID and anticipated budget shortfalls [his] position is being eliminated on July 31, 2020."  [Id. at ¶¶ 88].  Fountain alleges this explanation "flies in the face of" Perry's public announcements that the City's operations were "balanced" and there was "free cash."  [Id. at ¶¶ 91-95].

The City Council Defendants continued to disparage Fountain even after his role with the MPD was limited and then ultimately terminated.  On June 4, 2020, McCarty and Beauregard responded to a Facebook post by the MPD, which listed Fountain's contact information "in furtherance of the investigation" into a burglary.  [Id. at ¶¶ 86-87].  McCarty replied, "Contact former Methuen City Council Chairman Sean Fountain," while Beauregard wrote, "[W]e must clearly point out how the Fountain situation is an insult to all academy trained officers and has made a total mockery of the civil service appointment process.  Progress is being made but we will not stop fighting the corruption in that department.  It is outrageous and unacceptable and needs to stop."  [Id.].  In July 2020, Simard and McCarty both made "public inflammatory statements" about detectives and deputies at City Council meetings.  [Id. at ¶¶ 96, 99].  And on September 15, 2020, Beauregard published a letter to the editor of the *Eagle-Tribune*, stating that

he and his colleagues "had made a concerted effort to 'launch a vocal push for greater accountability within the department.'"[1] [Id. at ¶¶ 110]. In February 2021, City Council voted to rescind the legislation allowing for the appointment of intermittent police officers, though the state legislature has yet to ratify the vote to rescind. [See Dkt. 19-1 at 2-3].

Fountain now brings sixteen claims against the defendants. [Complaint at ¶¶ 117-201]. He first brings a claim against the City of Methuen, alleging he was terminated in violation of public policy ("Count I"). [Id. at ¶¶ 117-21]. Fountain also brings claims pursuant to 42 U.S.C. § 1983 against the City Council Defendants, alleging they harassed him for exercising his First Amendment right to the freedom of speech, specifically, his petition for approval to become a permanent intermittent police officer and his testimony to government agencies regarding the superior officers' contract vote ("Counts II-IV"). [Id. at ¶¶ 122-36]. Fountain brings essentially the same claims against the City Council Defendants under the Massachusetts Civil Rights Act as well ("Counts V-VII"). [Id. at ¶¶ 137-57]. Fountain also brings several state common law claims against the defendants. He alleges tortious interference with advantageous relations against the City Council Defendants ("Counts VIII-X"); libel and slander ("Count XI") and intentional infliction of emotional distress ("Count XII") against Simard; civil conspiracy against the City Council Defendants and Perry ("Count XIII"); and abuse of process against the City Council Defendants ("Counts XIV-XVI"). [Id. at ¶¶ 158-201].

The defendants filed a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), seeking dismissal of Fountain's complaint for failure to state a claim upon which relief can be granted. [Dkt. 25]. Fountain has opposed this motion. [Dkt. 33]. The Court heard oral argument on April 13, 2022.

---

[1] Fountain does not allege he was specifically named in this article.

## II.      Legal Standard

A motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) is "treated much like a Rule 12(b)(6) motion to dismiss."  Pérez-Acevedo v. Rivero-Cubano, 520 F.3d 26, 29 (1st Cir. 2008) (citing Curran v. Cousins, 509 F.3d 36, 43-44 (1st Cir. 2007)).  It differs, however, in that it "implicates the pleadings as whole," and is therefore based on the factual allegations in the complaint and answer.  Aponte-Torres v. Univ. of P.R., 445 F.3d 50, 55 (1st Cir. 2006).  Courts must "view the facts contained in the pleadings in the light most favorable to the nonmovants . . . and draw all reasonable inferences therefrom in their favor."  Id. at 54 (citing Rivera-Gomez, 843 F.2d at 635).  For a complaint to survive a motion for judgment on the pleadings, it "must contain factual allegations that 'raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true.'"  Pérez–Acevedo, 520 F.3d at 29 (citing Bell Atlantic v. Twombly, 550 U.S. 544, 555 (2007)).  Courts may also consider "documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice."  Haley v. City of Bos., 657 F.3d 39, 46 (1st Cir. 2011).  Judgment on the pleadings is proper only when the "uncontested and properly considered facts conclusively establish the movant's entitlement to a favorable judgment," Zipperer v. Raytheon Co., 493 F.3d 50, 53 (1st Cir. 2007) (citing Aponte-Torres, 445 F.3d at 54), that is, "when the nonmovant can prove no set of facts in support of a claim that would entitle it to relief," Pittner v. Castle Peak 2012-1 Loan Tr., 436 F. Supp. 3d 438, 440 (D. Mass. 2020) (citing Rivera-Gomez, 843 F.2d at 635).

## III.     Discussion

The defendants raise several arguments in support of their motion for judgment on the pleadings.  First, they argue that issue preclusion bars Fountain's wrongful termination claim

against the City of Methuen.  [Dkt. 25 at 1].  Second, they maintain that the City Council

Defendants are immune from liability.  [Id. at 2].  They relatedly contend that Fountain's civil

conspiracy claim against Perry must fail because he cannot be held liable for conspiracy with

immunized co-defendants.  [Id.].  Third, the defendants state that, regardless, Fountain's claims

fail as a matter of law.  [Id.].

### A.      Issue Preclusion (Count I)

The defendants argue that Fountain's claim against the City of Methuen for wrongful

termination in violation of public policy is barred by issue preclusion.  [Dkt. 26 at 5-6].  The

doctrine of issue preclusion, also referred to as collateral estoppel, is intended to "conserve

judicial resources, to prevent the unnecessary costs associated with multiple litigation[s], and to

ensure the finality of judgments."  Alba v. Raytheon Co., 809 N.E.2d 516, 521 (Mass. 2004)

(citation omitted).   Four factors must be satisfied for issue preclusion to apply: (1) there was a

"final judgment on the merits in the prior adjudication"; (2) the party against whom preclusion is

asserted was a party or in privity with a party in the previous adjudication; (3) the issue decided

in the prior adjudication is identical to the present issue; and (4) the previously decided issue was

"essential" to the judgment in the prior adjudication.  Id.  The defendants maintain that

Fountain's termination claim was already decided by an arbitrator in 2021, when the arbitrator

concluded that permanent intermittent police officers "may be removed by the selectman [later

the mayor] at any time for any reason."  [Dkt. 26 at 6 (quoting Dkt. 26-1 at 2 & n.2)].  Fountain

counters that the arbitrator merely evaluated whether the grievance was arbitrable and did not

consider the merits of his termination.  [Dkt. 33 at 7-8].  Fountain is correct.

The arbitrator explained that the issue before him was whether the termination grievance

filed by Fountain (and two other permanent intermittent police officers) was "substantively

arbitrable." [Dkt. 26-1 at 1].  Specifically, the arbitrator had to determine whether Fountain's termination and grievance process were governed by Ch. 201 of the Acts of 1945, legislation allowing Methuen to appoint intermittent police officers and providing that they "may be removed by the selectmen at any time for any reason," or by Massachusetts General Law ch. 150E, § 7(d), which governs labor relations for public employees, including those in the police officers' union.  [Id. at 8].  The arbitrator found that the grievance was "governed by Ch. 201 of the Acts of 1945 and not by the collective bargaining agreement negotiated under the aegis of Ch. 150E of the General Laws."  [Id. at 11].  As such, the grievances were "outside [the arbitrator's] jurisdiction under the collective bargaining agreement" and were "substantively non-arbitrable."  [Id.].  Clearly, the arbitrator did not reach the merits of Fountain's termination claim and, contrary to the defendants' assertions, did not "conclude[] that the City of Methuen may properly remove [] Fountain as a police officer at any time for any reason."  [Dkt. 26 at 6]. And even if the determination that Ch. 201 of the Acts of 1945 governs Fountain's wrongful termination claim necessarily implies that his employment is "at will," at-will employees may still be terminated in violation of public policy, an issue that was not addressed by the arbitrator. See King v. Driscoll, 638 N.E.2d 488, 492 (Mass. 1994) ("As an exception to the general rule that an employer may terminate an at-will employee at any time with or without cause, we have recognized that an at-will employee has a cause of action for wrongful termination only if the termination violates a clearly established public policy."); cf. Hennessy v. City of Melrose, 194 F.3d 237, 245 (1st Cir. 1999) ("Even an at-will employee . . . may not be dismissed for exercising rights protected under the First Amendment.").  The Court denies the defendants' motion as to Count I.

### B.      Immunity (Counts II-XVI)

The City Council Defendants argue that absolute legislative immunity applies to any claims against them, because their alleged actions were discretionary, concerned public safety and matters of public policy, and were undertaken in connection with their official legislative duties.  [Dkt. 26 at 7].  Fountain responds that absolute immunity does not apply because the City Council Defendants' acts were not legislative in nature, as they targeted a specific individual (him).  [Dkt. 33 at 10].  The City Council Defendants also maintain that they are entitled to qualified immunity.  Fountain counters that the City Council Defendants are not entitled to qualified immunity because he has sufficiently pleaded a violation of a concrete constitutional right.

### 1.      Absolute Immunity

Local legislators, including municipal officials, are "absolutely immune from suit under § 1983 for their legislative activities." Bogan v. Scott-Harris, 523 U.S. 44, 49, 52 (1998) ("The rationales for according absolute immunity to federal, state, and regional legislators apply with equal force to local legislators.").  Absolute immunity "affords protection not only from liability but from suit." Romero-Barcelo v. Hernandez-Agosto, 75 F.3d 23, 28 (1st Cir. 1996).  This immunity "attaches to all actions taken 'in the sphere of legitimate legislative activity.'" Bogan, 523 U.S. at 54 (citing Tenney v. Brandhove, 341 U.S. 367, 376 (1951)).  Acts that are "administrative in nature" do not give rise to absolute immunity.  Romero-Barcelo, 75 F.3d at 29 (citing Negron-Gaztambide v. Hernandez-Torres, 35 F.3d 25, 28 (1st Cir. 1994)).  Actions that "single out individuals or groups, rather than create general policies, are administrative actions, not legislative."  S. Middlesex Opportunity Council, Inc. v. Town of Framingham, 752 F. Supp. 2d 85, 111 (D. Mass. 2010) (citing Acevedo-Garcia v. Vera-Monroig, 204 F.3d 1, 9 (1st Cir.

2000)).  As such, the crucial question is "whether [the defendants'] acts were legislative."

Bogan, 523 U.S. at 54.  Whether an act is legislative "turns on the nature of the act, rather than

on the motive or intent of the official performing it."  Id.  The City Council Defendants would

have the Court attach absolute legislative immunity to their actions simply because their

comments "concerned the public's safety and matters of public policy," even if they were

directed at a specific individual.  [Dkt. 26 at 7-8].  Fountain would have the Court reject the City

Council Defendants' argument simply because they, at times, named Fountain or referenced his

employment circumstances specifically, rather than generally commenting on MPD hiring and

reform.  The inquiry, however, is not that simplistic.

Absolute legislative immunity is "justified and defined by the *functions* it protects and

serves, not by the person to whom it attaches."  Romero-Barcelo, 75 F.3d at 29 (citing Negron-

Gaztambide, 35 F.3d at 27).  This immunity "does not attach to the activities that are merely

'casually or incidentally related to legislative affairs.'"  Cushing v. Packard, 30 F.4th 27, 49 (1st

Cir. 2022) (citing United States v. Brewster, 408 U.S. 501, 528 (1972)).  Rather, the Court must

consider whether the defendants' actions were legislative "in form," such that they were "integral

steps in the legislative process," and "in substance," such that they "bore all the hallmarks of

traditional legislation."  Gonzalez-Droz v. Gonzalez-Colon, 717 F. Supp. 2d 196, 214 (D.P.R.

2010) (citing Bogan, 523 U.S. at 55).  Here, the City Council Defendants commented on City

Council's approval of an MPD contract; what they perceived to be improper hiring, training, and

control of officers by MPD; City Council's review of MPD policies; and possible impropriety by

a former City Council member.  [See Complaint at ¶¶ 35-38, 62, 66-67, 73-77, 86-87, 96, 99

110].  Many of these statements were made during City Council proceedings, including City

Council meetings and budget meetings, and City Council eventually voted to rescind the rule

allowing for the appointment of intermittent police officers.  The City Council Defendants'
comments, then, pertain to the quintessential functions and purposes of a municipal legislature,
and brief references to a particular individual in the course of City Council's deliberations on
broader policy issues do not necessarily remove those actions from the realm of "legislative" to
"administrative."  See Acevedo-Garcia, 204 F.3d at 8 (noting that employment decisions
"generally are administrative," while "policymaking and budgetary restructuring" are "traditional
legislative functions," and "[v]oting for legislation, the introduction of budget plans, and signing
an ordinance into law are 'quintessentially legislative' functions").  As such, the City Council
Defendants are immune from any civil action based on conduct directly related to City Council
proceedings.

At the same time, however, the City Council Defendants made several comments naming
or alluding to Fountain outside the realm of City Council forums and traditional legislative
activity, including when speaking with journalists or in posts on social media.  [See Complaint at
¶¶ 35-38, 66, 73, 75-77, 86-87, 110].  These statements are not shielded from suit by absolute
legislative immunity.  The purpose of absolute legislative immunity is to "insure that the
legislative function may be performed independently without fear of outside interference."
Acevedo-Garcia, 204 F.3d at 7 (citing Sup. Ct. of Va. v. Consumers Union of the U.S., 446 U.S.
719, 731 (1980)).   It cannot be said that the City Council Defendants' comments on social media
and to newspapers here were essential to the municipal officers' legislative function, such that
there would otherwise be fear of outside interference with legislative initiatives.

The Supreme Court's treatment of the Speech or Debate Clause, which is "generally . . .
equated [to] the legislative immunity to which state legislators are entitled under § 1983," is
instructive here.  Sup. Ct. of Va., 446 U.S. at 733 (collecting cases); see U.S. Const. art. I, § 6,

cl. 1; see also Romero-Barcelo, 75 F.3d at 29 (stating that the "scope of legislative immunity from suit under section 1983 is 'essentially coterminous' with the absolute immunity accorded members of Congress under the Speech or Debate Clause" (citation omitted)).  The Speech or Debate Clause protects members of Congress "not only from the consequence of litigation's results but also from the burden of defending themselves" for any "legitimate legislative activity," Tenny v. Brandhove, 341 U.S. 367, 367-77 (1951), which includes speech and conduct that is "an integral part of the deliberative and communicative processes by which Members [of Congress] participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House," Gravel v. United States, 408 U.S. 606, 625 (1972).  While this protection includes "[c]ommittee reports, resolutions, . . . the act of voting," and "things generally done in a session of the House by one of its members in relation to the business before it," it is not unlimited.  Powell v. McCormack, 395 U.S. 486, 502 (1969) (quoting Kilbourn v. Thompson, 103 U.S. 168, 204 (1881)).

On multiple occasions, the Supreme Court has determined that the Speech or Debate Clause did not shield legislators from liability for comments made beyond the legislative floor, including the publications of newsletters, press releases, and speeches delivered outside Congress.  See, e.g., Hutchingson v. Proxmire, 443 U.S. 111, 130 (1979) (holding that the Speech or Debate Clause did not immunize a senator from a libel suit because "neither the newsletters nor the press release [at issue] was 'essential to the deliberations of the Senate' and neither was part of the deliberative process"); Brewster, 408 U.S. at 512 (noting that "'news letters' to constituents, news releases, and speeches delivered outside the Congress . . . are political in nature rather than legislative").  Other courts have followed suit.  For example, the

Eleventh Circuit has explained that "[a]cts such as voting, speech making on the floor of the legislative assembly, preparing committee reports, and participating in committee investigations and proceedings are generally deemed legislative and, therefore, protected by the doctrine of legislative immunity," but "acts such as the public distribution of press releases and newsletters . . . are generally not protected by the doctrine of legislative immunity." Yeldell v. Cooper Green Hosp., Inc., 956 F.2d 1056, 1062 (11th Cir. 1992) (internal citations omitted).  Here, the City Council Defendants made several comments about Fountain on social media and to newspapers.  [See Complaint at ¶¶ 35-38, 66, 73, 75-77, 86-87, 110].  These comments did not further debate about city policies on the legislative floor and instead "are only 'casually or incidentally related to legislative affairs.'" Romero-Barcelo, 75 F.3d at 29 (citing Nat'l Ass'n of Social Workers v. Harwood, 69 F.3d 622, 630 (1st Cir. 1995)).  As such, absolute legislative immunity does not protect the City Council Defendants here from suit based on comments made outside the forum of City Council meetings, and the Court cannot enter judgment in favor of the defendants on that basis as to Counts II-XVI.  See Barcelo v. Agosto, 876 F. Supp. 1332, 1343 (D.P.R. 1995) ("[D]efendants' alleged dissemination of false, defamatory, and slanderous information about the plaintiff through press releases, interviews, and speeches occurring outside the strict scope of their legislative duties is not similarly protected by the immunity."), aff'd Romero-Barcelo, 75 F.3d at 35.  However, the City Council Defendants may still be immune from suit with respect to Fountain's civil rights claims (Counts II-VII) based on the doctrine of qualified immunity.

2.       **Qualified Immunity**

The City Council Defendants argue that they are protected by qualified immunity even if absolute legislative immunity does not apply.[2]  [Dkt. 26 at 8].  They claim that, as City Councilors, they had the right to speak about matters of public interest and safety, and their concerns about Fountain and MPD were "well-founded."  [Id.].  Fountain contends that qualified immunity is inapplicable because it does not protect defendants who have violated a "concrete constitutional right."  [Dkt. 33 at 11].

The doctrine of qualified immunity "protects government officials . . . from suit and liability for monetary damages under [Section] 1983." Acevedo-Garcia, 204 F.3d at 10.  Section 1983 provides that "[e]very person" acting "under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia" who subjects or causes to subject someone "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States shall be liable to the injured party.  42 U.S.C. § 1983. An individual asserting a Section 1983 claim must show that the challenged conduct is "attributable to a person acting under color of state law" and that the conduct was a "denial of rights secured by the Constitution or by federal law."  Soto v. Flores, 103 F.3d 1056, 1061 (1st Cir. 1997); see Graham v. Connor, 490 U.S. 386, 393-94 (1989) (explaining that Section 1983 is "not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred" (citation omitted)).

Qualified immunity provides that "government officials performing discretionary functions" are generally "shielded from liability for civil damages insofar as their conduct does

---

[2] Because the City Council Defendants have established absolute legislative immunity for any acts that occurred within City Council meetings, the Court will consider only those allegations related to conduct that occurred beyond that forum when examining whether qualified immunity applies.

not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Floyd v. Farrell, 765 F.2d 1, 4 (1st Cir. 1985) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). The Court must decide "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009) (citing Pearson v. Callahan, 555 U.S. 223, 232, 236 (2009)). To answer the second question, the Court must evaluate whether the law was "sufficiently clear" such that "every reasonable official would understand that what he is doing is unlawful." Eves v. LePage, 927 F.3d 575, 583 (1st Cir. 2019) (citation and internal quotation marks omitted). In other words, immunity "exists even where the abstract 'right' invoked by the plaintiff is well-established, so long as the official could reasonably have believed 'on the facts' that no violation existed." Dirrane v. Brookline Police Dep't, 315 F.3d 65, 69 (1st Cir. 2002) (citations omitted). Subjective intent is irrelevant to a qualified immunity defense. Abreau-Guzman v. Ford, 241 F.3d 69, 73 (1st Cir. 2001) (citing Crawford-El v. Britton, 523 U.S.574, 588 (1998)). Courts need not follow the two-step analysis sequentially. Maldonado, 568 F.3d at 270. Fountain has claimed that the City Council Defendants violated his constitutional rights by "wag[ing] a campaign of threats, intimidation, and coercion" against him after he "engaged in protected free speech," including "petitioning" for his dual role as a City Council member and intermittent police officer and "providing testimony to state and federal agencies." [Complaint at ¶¶ 123-25, 128-30, 133-35, 140-42, 147-49, 154-56]. The Court is not convinced Fountain has established a violation of his constitutional rights, and even if he has, those rights were not sufficiently established at the time of the alleged violation.

Undoubtedly, petitioning and testifying are protected activities under the First Amendment.  See Najas Realty, LLC v. Seekonk Water Dist., 821 F.3d 134, 141 (1st Cir. 2016) (noting that the First Amendment "protects (among other things) the right to free speech and the right to petition all branches of the government").  And the First Amendment "guarantees not only freedom from government censorship, but also freedom from official retaliation on the basis of protected speech." Mattei v. Dunbar, 217 F. Supp. 3d 367, 373 (D. Mass. 2016) (citing Hartman v. Moore, 547 U.S. 250, 256 (2006)).  A "campaign of harassment can support a First Amendment retaliation claim if the harassment would deter a reasonably hardy individual in the exercise of his or her First Amendment rights." Barton v. Clancy, 632 F.3d 9, 30 (1st Cir. 2011) (citations omitted).  However, courts are "not typically receptive to retaliation claims arising out of government speech." Najas Realty, 821 F.3d at 143.  This is because public officials have "an obligation to speak out about matters of public concern," which include topics "fairly considered as relating to any matter of political, social, or other concern to the community." Id. (affirming the dismissal of the plaintiff's First Amendment retaliation claim).

In Najas Realty, LLC v. Seekonk Water District, the First Circuit found that the plaintiffs' First Amendment retaliation claim was not plausible on its face. Id. at 142.  The plaintiffs had sought approval for construction on a parcel of land, and one of the defendants, the Water District's Superintendent, voiced at various meetings his objections to the plaintiffs' plans based on the potential for water contamination. Id. at 139.  The plaintiffs claimed the Superintendent "embarked on a campaign of defamation" and spread "supposed falsehoods" about the project in violation of their First Amendment right to petition. Id.  The First Circuit explained that there was no indication in the record that the Superintendent's beliefs on the potential impact of the project "were not genuinely held." Id. at 142.  The First Circuit also

explained that the Superintendent "had a duty . . . to raise objections he deemed valid and it is hard to find any allegations in the complaint that [the Superintendent] was doing anything more than fulfilling this duty." Id. at 143. Because his official position charged him with "maintaining safe drinking water" for the town's residents, and "[n]ot only do public officials have free speech rights, but they also have an obligation to speak out about matters of public concern," the plaintiffs failed to plead a plausible First Amendment retaliation claim. Id. (citing Goldstein v. Galvin, 719 F.3d 16, 30 (1st Cir. 2016)).

Similarly, in Barton v. Clancy, the plaintiff brought a First Amendment retaliation claim against the city's mayor after he publicly criticized the plaintiff's ability to coach basketball at a city high school, following the plaintiff's retirement on disability, and called for the rescission of the plaintiff's appointment in letters and interviews with local newspapers. 632 F.3d at 11-12. The First Circuit concluded that the mayor was entitled to qualified immunity. Id. at 12. The First Circuit observed that the mayor's "statements consisted of substantively appropriate speech criticizing the decision to hire [the plaintiff] as a city-employed coach while he was receiving a disability pension from the city," which invoked the financial interests of the city. Id. at 30. The First Circuit further explained that the mayor "instigated a public controversy about an unusual hiring decision that had larger policy implications," and his "focus on that decision, the legitimate fiscal-responsibility thrust of his commentary, and the limited nature of his records inquiry" made it "far from clear that [the mayor's] actions were sufficiently oppressive to chill the speech of a reasonably hardy individual." Id. As such, the First Circuit could not say that a "reasonable official" in the mayor's shoes would have "understood that his conduct violated" the plaintiff's constitutional rights. Id. (citation omitted).

Here, Fountain was a City Council member who was also employed by the MPD during (part-time) and after (full-time) his tenure as a municipal officer.  [See Complaint at ¶¶ 10, 13-22].  While on City Council, he voted on a contract for superior officers in the MPD, which he admits "became the subject of much public controversy within the City [of Methuen] which continues to this day."  [Id. at ¶¶ 25-32].  Fountain also acknowledges that, as an intermittent police officer, he was ineligible for promotion unless he took the Civil Service Exam, which is required of reserve officers, patrol officers, and ranking officers, though he claims he was eventually "*assigned* to the role of detective, not *promoted* . . . based on exceptional performance" and therefore was not subject to the Civil Service Exam requirements.  [Id. at ¶¶ 50, 52, 60 (emphasis added)].  The City Council Defendants' comments about Fountain, at their core, questioned whether Fountain's appointment to permanent intermittent police officer was appropriate and raised concerns of corruption in Methuen's public services.  The City Council Defendants' alleged actions, like the mayor's in Barton, "instigated a public controversy about an unusual hiring decision that had larger policy implications" reaching areas typically within the purview of the City Council, Barton, 632 F.3d at 30, and they "had a duty" to raise those concerns, Najas Realty, 821 F.3d at 143.  Accordingly, the City Council Defendants are entitled to qualified immunity as to Fountain's First Amendment claims.  They are also entitled to qualified immunity as to Fountain's Massachusetts Civil Rights Act claims, which are also premised on the First Amendment.[3]  See Wagner v. City of Holyoke, 241 F. Supp. 2d 78, 96 (D. Mass. 2003) ("Qualified immunity under § 1983 applies with equal force to claims brought

---

[3] Fountain also alleges in a cursory fashion that he has a "due process interest in his continued employment with the City of Methuen Police Department" in connection with his Massachusetts Civil Rights Act claims, though the majority of his allegations focus on the First Amendment.  [See Complaint at ¶¶ 139, 146, 153].  Fountain, however, has failed to allege any facts demonstrating that the City Council Defendants could be held responsible for any due process violations, as the City Council Defendants were not responsible for hiring or terminating Fountain.

under the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, § 11I."); Duarte v. Healy, 537 N.E.2d 1230, 1232 (Mass. 1989) ("We conclude it [the 'issue of qualified immunity under our State Civil Rights Act'] to be consistent with the intent of the Legislature in enacting the Civil Rights Act to adopt thereunder the standard of immunity for public officials developed under § 1983.").

Because the Court finds that absolute or qualified immunity applies to all of the City Council Defendants' alleged actions in violation of Fountain's First Amendment rights, brought pursuant to 42 U.S.C. § 1983 or the Massachusetts Civil Rights Act, the Court grants the defendants' motion for judgment as to Counts II-VII.

### C.    Civil Conspiracy (Count XIII)

Fountain has alleged that the City Council Defendants and Perry "acted in concert to inflict wrongdoing" upon him by "attack[ing] [his] qualifications and training as a police officer, the circumstances under which he was hired, and his integrity as a City Councilor," which "interfered with his employment" with the MPD.  [Complaint at ¶¶ 184-85].  The defendants argue that the City Council Defendants are immune from liability and Fountain's civil conspiracy claim against Perry must fail because he cannot conspire with protected individuals. [Dkt. 26 at 9-10].  The defendants do not cite any statutory or case law supporting this contention.  Fountain counters that judgment on the conspiracy claim should not be granted because the City Council defendants are not immune from suit.  [Dkt. 33 at 12].  The defendants also maintain that Fountain has failed to allege facts supporting a civil conspiracy claim.  [Dkt. 26 at 14-15; Dkt. 37 at 4].

The Court has already determined that the City Council Defendants are not entitled to absolute immunity for comments made outside the purview of City Council meetings—and

therefore did not grant judgment for the defendants for all claims against the City Council Defendants—and qualified immunity applies only to Fountain's civil rights claims (Counts II-VII). See supra. Fountain has brought several other charges against the defendants, including tortious interference with advantageous relations, libel, intentional infliction of emotional distress, and abuse of process. Thus, the defendants' first argument fails.

To establish civil conspiracy, the plaintiff must demonstrate that "a combination of persons acted pursuant to an agreement to injure the plaintiff." Gutierrez v. Mass. Bay Transp. Auth., 772 N.E.2d 552, 568 (Mass. 2002). There are two kinds of civil conspiracy. Kurker v. Hill, 689 N.E.2d 833, 836 (Mass. App. Ct. 1998). The first requires the plaintiff to establish that the "defendants, acting in unison, had some peculiar power of coercion over [the] plaintiff that they would not have had if they had been acting independently." Aetna Cas. Sur. Co. v. P&B Autobody, 43 F.3d 1546, 1563 (1st Cir. 1994). That approach is not applicable here, which Fountain acknowledges. [See Dkt. 33 at 17]. The second derives from "concerted action" between multiple individuals, in which liability is imposed on one for the tort of another. Kurker, 689 N.E.2d at 836. For this type of civil conspiracy to apply, there must be (1) a "common design or agreement, though not necessarily express, between two or more persons to do a wrongful act" and (2) proof of "some tortious act in furtherance of the agreement." Aetna, 43 F.3d at 1564. Under this approach, a defendant must provide "substantial assistance, with the knowledge that such assistance is contributing to a common tortious plan." Kurker, 689 N.E.2d at 837. Fountain's complaint is devoid of any facts suggestive of a "common design or agreement," let alone "substantial assistance" provided by the City Council Defendants to Perry or vice versa prior to Fountain's termination. Fountain does not even allege that Perry and the City Council Defendants ever met or spoke. The fact that the City Council Defendants each

voiced their concerns about the MPD and Fountain's role there does not imply a "common design or agreement," as this topic related to public safety and policy within City Council and the mayor's responsibilities and pending City Council initiatives.  As such, the Court grants the defendants' motion for judgment on the pleadings as to Count XIII.

### D.      Merits of the Remaining Claims (Counts VIII-XII, XIV-XVI)

Fountain brings several other state common law claims against the City Council Defendants: tortious interference with advantageous relations, libel and slander, intentional infliction of emotional distress, and abuse of process.  As already explained, absolute legislative immunity does not shield the City Council Defendants from these claims, as they made several statements not protected by such immunity, and qualified immunity applies only to the alleged civil rights violations.  The defendants argue that, regardless, these claims should be dismissed on the merits.  [Dkt. 26 at 13-20].

### 1.      Tortious Interference with Advantageous Relations (Count VIII-X)

The defendants argue that Fountain's claims for tortious interference with advantageous relations must fail because there is no evidence that the defendants "acted with any purpose other than to ensure that the police department had properly qualified police officers in positions for which they were trained" and Methuen had the right to terminate Fountain at will.  [Dkt. 26 at 14].  Fountain counters that he need not show that the defendants acted with malicious purpose, and he has alleged facts sufficient to plead a plausible claim to relief.  [See Dkt. 33 at 17].

To establish a plausible claim for tortious interference with advantageous relations under Massachusetts law, a plaintiff must show that (1) there was a "known advantageous employment relationship"; (2) the defendant knew of that relationship; (3) the defendant's interference was intentional and "improper in motive or means"; and (4) the plaintiff suffered economic harm as a

result of the defendant's conduct.  Ayash v. Dana-Farber Cancer Inst., 822 N.E.2d 667, 690

(Mass. 2005).[4]  Improper means include "violation of a statute or common-law precept, e.g., by

means of threats, misrepresentation, or defamation," and "evidence of retaliation or ill will

toward the plaintiff" can support allegations of improper motives.  Cavicchi v. Koski, 855

N.E.2d 1137, 1142 (Mass. App. Ct. 2006).

As an initial matter, whether the City of Methuen had the right to terminate Fountain at

will is irrelevant to the City Council Defendants' actions here.  While Fountain has alleged that

he had a relationship with the MPD, which the City Council Defendants knew, he has failed to

allege facts sufficient to demonstrate that the City Council Defendants harbored any improper

motive or utilized improper means to intentionally interfere with Fountain's relationship with

MPD.  Rather, as already discussed by the Court, the City Council Defendants spoke on matters

of public concern, which Fountain happened to be involved in, and, indeed, they had a duty to do

so as municipal officers elected by the people.  The Court grants the defendants' motion for

judgment as to Counts VIII-X.

### 2. Libel and Slander (Count XI)

Fountain brings a claim for libel and slander against Simard.  The defendants argue that

Fountain's claims against Simard for libel and slander cannot succeed because Simard's

statements were true or, alternatively, were opinions based on disclosed facts.  [Dkt. 26 at 17-

20].  The defendants also claim that Simard has a conditional privilege to make statements about

the MPD and Fountain.  [Id. at 20].  Fountain responds that Simard's statements were "fact-

based," not "opinion-based," and false.  [Dkt. 33 at 19].

---

[4] The defendants also appear to argue that there must be proof of actual malice.  [Dkt. 26 at 13-14].  Proof of actual malice is required when an employee is claiming a supervisor has intentionally interfered with the employee's advantageous relationship with the employer or a corporate official is acting in an official capacity.  See Ayash v. Dana-Farber Cancer Institute, 822 N.E.2d 667, 690 (Mass. 2005).  Such is not the case here.

To prevail on a claim of libel or slander, a plaintiff must establish that "(1) the defendant published a defamatory statement of and concerning the plaintiff; (2) the statement was a false statement of fact (as opposed to opinion); (3) the defendant was at fault for making the statement, and any privilege that may have attached to the statement was abused; and (4) the plaintiff suffered damages as a result, or the statement was of the type that is actionable without proof of economic loss." Lawless v. Estrella, 160 N.E.3d 1253, 1257 (Mass. App. Ct. 2020) (citing Downey v. Chutehall Constr. Co., 19 N.E.3d 470, 474 (Mass. App. Ct. 2014)). In most cases, the statement "must be false." Barrows v. Wareham Fire Dist., 976 N.E.2d 830, 836 n.6 (Mass. App. Ct. 2012). Moreover, the statement "must reasonably be understood either as a statement of actual fact, or one that implies defamatory facts," and statements "of pure opinion are not actionable." Lawless, 160 N.E.3d at 1257-58. Whether a statement is one of fact or opinion is a question of law "if the statement unambiguously constitutes either fact or opinion." Id. at 1259.

In the complaint, Fountain references three specific statements Simard made "falsely and publicly." [Complaint at ¶ 174]. The first occurred at an October 2019 "Meet the Candidates" event, when Simard said he would "implement a hiring freeze to stop the political hack jobs" and that City Council should follow charter rules and ethics laws that had been "grossly ignored with the police superiors' contract." [Id. at ¶ 38]. The second was at a City Council meeting in March 2020, when Simard stated that a "detective who isn't certified and bypassed the hiring process is working major cases, even homicides." [Id. at ¶ 63]. The third, a quotation in a newspaper article in May 2020, questioned "why . . . Fountain's training [was] accelerated and modified," allowing him to be promoted to detective in eight months. [Id. at ¶ 77]. The first statement does not name or reference Fountain and instead critiques City Council as a whole.

The second statement, which Simard made during a City Council meeting, is protected by legislative immunity.  These two statements are therefore not actionable as to libel and slander claims. The third statement, which names Fountain and to which legislative immunity does not apply, requires slightly closer examination.  Still, when looked at in context, Fountain has failed to establish that Simard's third comment was defamatory.  Simard made that statement at the same time he asked "why [Methuen's] police department would . . . circumvent the civil service hiring process and appoint a city councilor/firefighter to a police intermittent position."  [Id. at ¶ 76].  Fountain himself has admitted that he did not take the Civil Service Exam, as required of other officers, and that intermittent officers are "not subject to the Civil Service requirements." [Id. at ¶ 50].  As such, Simard's statement cannot be construed as false statement of fact that is defamatory.  The Court therefore grants the defendants' motion as to Count XI.

### 3. Intentional Infliction of Emotional Distress (Count XII)

Fountain brings a claim for intentional infliction of emotional distress against Simard. The defendants contend that Simard did not act improperly and that Fountain's allegations are insufficient to sustain a claim for intentional infliction of emotional distress under Massachusetts law.  [Dkt. 26 at 17].  Fountain argues he has met this burden.  [Dkt. 33 at 18-19].  To state a claim for intentional infliction of emotional distress under Massachusetts law, a plaintiff must show that (1) the actor "intended to inflict emotional distress" or "knew or should have known" that emotional distress would result from the conduct; (2) the conduct was "extreme and outrageous," "beyond all possible bounds of decency," and "utterly intolerable in a civilized community"; (3) the defendant's actions caused the plaintiff's distress; and (4) the plaintiff's emotional distress was "severe," such that no reasonable person could be expected to endure it. Doyle v. Hasbro, Inc., 103 F.3d 186, 195 (1st Cir. 1996) (citing Agis v. Howard Johnson Co.,

355 N.E.2d 315, 318-19 (Mass. 1976)).  The plaintiff must allege facts meeting a "requisite level of severity" of emotional distress "that no reasonable [person] could be expected to endure," a high standard to meet.  Boyle v. Barnstable Police Dep't, 818 F. Supp. 2d 284, 310 (D. Mass. 2011).

Fountain has not alleged any facts—beyond conclusory, sweeping statements that the Court need not credit—suggesting that Simard intended to inflict emotional distress or that he otherwise knew or should have known that his comments would result in severe emotional distress to Fountain.  He has also failed to establish that Simard's conduct was extreme and outrageous.  Simard, as a City Council member, has a duty to speak about issues of public concern, controversy, and safety.  As such, the Court cannot say that Simard's comments amounted to an "extreme and outrageous" "patten of harassment" that was intended to "shock and harm a person's peace of mind."  Tonneson v. Cambridge College, No. 10-cv-12004-RWZ, 2011 WL 3798874, at *3 (D. Mass. Aug. 29, 2011); see Smith v. Jenkins, 718 F. Supp. 2d 155, 172 n.26 (D. Mass. 2010).  Fountain's allegations are therefore insufficient to establish a claim to intentional infliction of emotional distress against Simard.  See Quinn v. Walsh, 732 N.E.2d 330, 338 (Mass. App. Ct. 2000) (citing Tetrault v. Mahoney, Hawkes & Goldings, 681 N.E.2d 1189, 1197 (Mass. 1997) (noting that "mere insults, indignities, threats, annoyances, petty oppressions or other trivialities" are not enough to establish a claim for intentional infliction of emotional distress).  The Court grants the defendants' motion as to Count XII.

### 4. Abuse of Process (Count XIV-XVI)

Fountain alleges the City Council Defendants "utilized official process" for "ulterior, illegitimate, improper and illegal purposes" in their "successful attempts to separate [Fountain] from his employment" as a full-time permanent intermittent police officer with the MPD.

[Complaint at ¶¶ 188-189, 193-94, 198-99].  The defendants argue that Fountain has failed to allege that the City Council Defendants used a "process" recognized by the courts as actionable under an abuse-of-process claim and, even if he did, the City Council Defendants used any such process for its stated purpose.  [Dkt. 26 at 16].  Fountain does not respond to this argument.

Under Massachusetts law, an abuse of process claim requires the plaintiff to show that a "'process' was used, for an ulterior or illegitimate purpose, resulting in damage."  Scholz v. Goudreau, 132 F. Supp. 3d 239, 260 (D. Mass. 2015) (quoting Psy-Ed Corp. v. Klein, 947 N.E.2d 520, 534 (Mass. 2011)).  Abuse of process claims in Massachusetts courts have been limited to three types of processes: writs of attachment, the process used to institute a civil action, and the process related to the bringing of criminal charges.  Jones v. Brockton Public Markets, Inc., 340 N.E.2d 484, 485-86 (Mass. 1975) (citations omitted).  As such, "process" in the context of "abuse of process" refers to "the papers issued by a court to bring a party or property within its jurisdiction."  Id. (declining to extend the definition of process to include injunctions); see Gill v. United States, 516 F. Supp. 3d 64, 82 (D. Mass. 2021).

Fountain does not allege that any cognizable process was used here.  In fact, he does not specify the process used at all.  He states merely that the City Council Defendants "utilized official process" to "separate [Fountain] from his employment" with the MPD.  [Complaint at ¶¶ 188, 193, 198].  Nothing in the complaint can be read to be a "process" as defined by Massachusetts law for claims of abuse of process.  See Jones, 340 N.E.2d at 485-86.  Fountain's failure to address the defendants' abuse-of-process arguments appears to concede this.  See McMann v. Selene Fin. LP, 332 F. Supp. 3d 481, 485 (D. Mass. 2018) (noting that an opposition that "does not address" a defendant's argument "seems to concede the point").  The Court grants the defendants' motion as to Counts XIV-XVI.

**IV.     Conclusion**

For the foregoing reasons, the defendants' motion for judgment on the pleadings [Dkt. 25] is **GRANTED IN PART** and **DENIED IN PART**.  The Court **GRANTS** judgment in favor of the defendants as to Counts II, III, IV, V, VI, VII, VIII, IX, X, XI, XII, XIII, XIV, XV, XVI, and **DENIES** the defendants' motion for judgment on the pleadings as to Count I.  All claims against Perry, Simard, Beauregard, and McCarty have been dismissed.  Only Fountain's claim for wrongful termination against the City of Methuen remains.

      **SO ORDERED.**

Dated: September 22, 2022                /s/ Angel Kelley
                                             Hon. Angel Kelley
                                             United States District Judge